UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA

    - against -

TARIQ AHMED,

               Defendant.

------------------------------------X

10 Cr. 195-02 (RWS)

SENTENCING OPINION

**Sweet, D.J.**

On July 27, 2011, Tariq Ahmed ("Ahmed" or "Defendant") pleaded guilty to Counts 1 through 5 for one count of conspiracy to commit credit card fraud, two counts of credit card fraud, one count of identification fraud and one count of conspiracy to commit immigration fraud.  For the reasons set forth below, Ahmed will be sentenced to 75 months' imprisonment to be followed by three years supervised release.  Defendant will forfeit to the United States all property, real and personal, involved in the offense, or traceable to such property, charged in Counts 1, 2 and 3.  Defendant will also be required to pay a special assessment of $500.

1

**Prior Proceedings**

Information S1 10 CR 195 (RWS) was filed in the Southern District of New York on July 27, 2011.

Count 1 charges that from at least 2005 through September 2009, in the Southern District o New York and elsewhere, Ahmed and others conspired to commit credit card fraud.

Count 2 charges that from at least 2004 through September 2009, Defendant trafficked in and used fraudulent credit cards during a one-year period, and by such conduct obtained things of value aggregating $1,000 and more during that period.

Count 3 charges that from at least 2004 through September 2009, Defendant committed credit card fraud with one or more credit cards which were issued to other persons, to receive payment and other things of value during a one-year period, the aggregate value of which was equal to and greater than $1,000.

Count 4 charges that from at least 2004 through

2

September 2009, in the Southern District of New York and elsewhere, Defendant unlawfully possessed and used, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c).

Count 5 charges that from at least 2004 through 2007, in the Southern District of New York and elsewhere, Defendant and others conspired to submit a false immigration application, in violation of 18 U.S.C. § 1546(a).

Defendant was arrested on September 30, 2009, and was detained until October 31, 2011, when he was released on a $100,000 unsecured bond and strict pretrial supervision, including the surrender of all travel documents and travel restriction to the Southern District of New York, Eastern District of New York and District of New Jersey.

On April 29, 2010, co-defendant Mohammed Janjua ("Janjua") (P57142/L.Y. Ramos) pleaded guilty to Counts One through Three only of Indictment 10 CR 195 (RWS) for conspiracy to commit credit card fraud and credit card fraud. On October 25, 2010, this Court imposed a sentence of 40 months' imprisonment, three years of supervised release and a

3

restitution order in the amount of $454,943.99.

On September 16, 2011, co-defendant Irshad Ahmid ("Ahmid") (P61151/M. Fisher) pleaded guilty to Count 1 only of Indictment 10 CR 195 (RWS) for conspiracy to commit access device fraud.   On November 8, 2011, this Court imposed a sentence of time served, with supervised release to be deferred until Ahmid returns to the U.S.   A restitution order in the amount of $74,199 was also imposed.

In a related case, Hassan Choudhry ("Choudhry") (P57144/S. Matthews) pleaded guilty as charged in one-count Misdemeanor Information 10 CR 201 (AJP) for identity theft on April 6, 2010.   On October 29, 2010, the Honorable Andrew J. Peck imposed a sentence of 5 years' probation and a restitution order in the amount of $1,447.

Ahmed's sentencing is currently scheduled for November 12, 2013.

**The Sentencing Framework**

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second

Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d
Cir. 2005), the sentence to be imposed was reached through
consideration of all of the factors identified in 18 U.S.C.
§ 3553(a), including the Advisory Guidelines.    Thus, the
sentence to be imposed here is the result of a consideration of:

(1)   the nature and circumstances of the offense and
      the history and characteristics of the defendant;

(2)   the need for the sentence imposed —

      (A)   to reflect the seriousness of the offense,
            to promote respect for the law, and to
            provide just punishment for the offense;

      (B)   to afford adequate deterrence to criminal
            conduct;

      (C)   to protect the public from further crimes of
            the defendant; and

      (D)   to   provide   the   defendant   with   needed
            educational or vocational training, medical
            care, or other correctional treatment in the
            most effective manner;

(3)   the kinds of sentences available;

(4)   the kinds of sentence and the sentencing range
      established for —

      (A)   the applicable category of offense committed
            by the applicable category of defendant as
            set forth in the guidelines . . .;

(5)   any pertinent policy statement . . . [issued
      by the Sentencing Commission];

(6)   the   need   to   avoid   unwarranted   sentence
      disparities among defendants with similar
      records   who   have   been   found   guilty   of
      similar conduct; and

5

(7)   the need to provide restitution to any victims of
the offense.

18 U.S.C. § 3553(a).   A sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether that sentence is a so-called Guidelines sentence or not.   See Crosby, 397 F.3d at 114-15.

## The Defendant

The Court adopts the facts set forth in the Presentence Investigation Report ("PSR") with respect to Defendant's personal and family history.

## The Offense Conduct

The following description draws from the PSR.   The specific facts of the underlying conduct are adopted as set forth in that document.

Since at least 2007, FBI agents, the New York State Attorney General's Office and other law enforcement agencies investigated a credit card fraud ring operating in New York City.   The ring operated, in part, from a company called "Nazir

Associates," which was located at 39-04 43rd Avenue in Queens, New York (the "Nazir Associates Fraud Ring" or the "Fraud Ring"). In about 2006, Nazir Associates maintained an office at 45 West 34th Street in Manhattan, New York.

Nazir Associates purported to provide services to customers who needed to "repair" their credit. Through their association with this business, members of the Nazir Associates Fraud Ring were able to obtain personal identification information of others, including the personal identification information of individuals who had no legal immigration status in the United States. The Fraud Ring's members then exploited such information after those individuals were deported from, or otherwise left, the United States.

Since at least 2006, individuals at the Nazir Associates engaged in large-scale identity theft and credit card fraud. Among other things, Defendant and his associates would use customers' personal identification information without the customers' permission in order to obtain credit cards in those individuals' names and/or to make fraudulent charges using those customers' credit cards. Co-defendant Mohammad Janjua was one of the owners of Nazir Associates.

7

Persons committing access device fraud frequently traffic in what are called "files." A "file" typically consists of several pieces of personal identification information of an individual, and may include a person's name, address, Social Security number, birth date, mother's maiden name and phone number. A "file" may also include a credit report and credit cards in an individual's name. Credit card fraud rings buy and sell "files" with the intent that individuals buying the "files" will use them to obtain credit cards in other individuals' names, use those credit cards to purchase items, make collusive charges and obtain cash advances, and then default on the unpaid balances of the credit cards. This process is sometimes referred to as "busting out" a "file."

The Government obtained information about the Nazir Associates Fraud Ring from various sources, including but not limited to cooperating witnesses, surveillance, court-authorized intercepted wire calls, an undercover agent and financial records.

From 2005 to August 2007, one cooperating witness ("CW-1") bought files and made collusive charges with members of the Nazir Associates Fraud Ring. CW-1 had known Janjua since at least 2005. From about 2005 to 2007, CW-1 made approximately

$100,000 in collusive charges with Janjua.   Those charges were
incurred at Nazir Associates, both when the business was located
in Queens, New York, and when it was located in Manhattan, New
York.

In 2006 (prior to his cooperation), CW-1 met with
Janjua and another individual at Nazir Associates in Queens, New
York, in order to purchase files from that individual.   In June
2009, CW-1 was shown several photographs of individuals
associated with and/or surveilled at Nazir Associates, including
a photograph of Ahmid.   CW-1 identified Ahmid as the individual
from whom CW-1 purchased files in 2006.

During the 2006 meeting with Janjua and Ahmid, CW-1
purchased from Ahmid two files in the names of individuals
identified herein as "Jameel" and "Raju".   CW-1 agreed to pay
Ahmid approximately $12,000 to $14,000 for each of the two
files.   That money was to be paid to Ahmid through collusive
charges made by Janjua.   CW-1 also received a percentage of the
collusive charges made using the "Jameel" and "Raju" files.

Based on the information provided by CW-1, law
enforcement officers obtained a credit report for "Jameel,"
which listed 218 Grand Street, Jersey City, New Jersey, as one

9

of his previous addresses.   Officers also obtained a credit report for Ahmid, showing that one of his previous addresses was also 218 Grand Street, Jersey City, New Jersey.   Individuals who commit credit card fraud sometimes list their own addresses as the mailing address of record for a "file" in order to be able to receive mail and credit cards for which they fraudulently applied in other names.

In the course of the investigation, the officers determined that 845 Bergen Street, Jersey City, New Jersey, was an address associated with the "Raju" file.   According to United States Postal Service records, there was an order on file with the Post Office to forward all mail from the Bergen Street Address to an "Arshad Ahmid" at 213 Summit Avenue, Jersey City, New Jersey.   According to credit reports, 213 Summit Avenue, Jersey City, New Jersey, was a previous address for Ahmid.

Documents obtained from credit reporting agencies for the "Raju" and "Jameel" files reflected more than $180,000 in defaulted and/or overdue credit card charges on the accounts, which were consistent with those accounts having been "busted out" and used for fraud.

Another cooperating witness ("CW-2") worked with

10

Defendant and Janjua and saw Ahmid at Nazir Associates multiple times throughout 2008 and 2009.  At a meeting in about December 2008, Ahmid gave CW-2 a copy of his driver's license in connection with a discussion they were having.  That license listed Ahmid's address as 845 Bergen Street, the same address associated with the "Raju" file.

In about early 2009, Janjua attempted to sell CW-2 several files, including files in the names of two individuals identified herein as "Parveen" and "Qassar."  Janjua provided a copy of a credit report for "Qassar" which listed one of Qassar's addresses as 213 Summit Avenue, in Jersey City, New Jersey, the same address to which mail was being forwarded to the attention of "Arshad Ahmid."  Officers obtained a credit report for "Parveen," which listed one of "Parveen's" addresses as 845 Bergen Street, another address from which mail was being forwarded to the attention of "Arshad Ahmid."

In November 2008, as part of the investigation into the Nazir Associates Fraud Ring, the Federal Bureau of Investigation ("FBI") provided CW-2 with two credit cards in the names of fictitious individuals (the "November Credit Cards"). CW-2 met with Defendant and Janjau at Nazir Associates in Queens, New York, on November 17, 2008.  During the meeting, CW-

11

2 provided Defendant and Janjua with the November Credit Cards.

The November 2008 Collusive Charges

On November 18, 2008, CW-2 placed a phone call from Manhattan to Defendant. During that conversation, CW-2 and Defendant discussed, among other things, collusive charges that Defendant had made, and attempted to make, on the November Credit Cards. Fraudulent charges were made throughout November 2008 on the November Credit Cards.

In November and December 2008, Defendant paid CW-2 at least $6,700 in connection with collusive charges made on the November Credit Cards. CW-2 sometimes was paid in United States currency. CW-2 was paid at least once by Defendant with two checks drawn on an account in the name "Rabia International Corp." More than $9,000 was charged on the November Credit Cards during November 2008. The charges were credited to the accounts of "MS Superfocus" and "Rabia International." MS Super Focus and Rabia International were registered in New York as corporations. The companies listed 45 West 34th Street as the address to which process should be served for each company: the same address at which Nazir Associates' Manhattan office was located.

12

The February 2009 Files

On February 18, 2009, Janjua met with CW-2 at a location in Manhattan, New York. At that meeting, Janjua agreed to provide at least two files to CW-2 in the names of individuals identified herein as "Amjad" and "Ameen" in exchange for $10,000. Janjua also gave CW-2 a mobile phone which was under the name "Ameen," so that CW-2 could service "Ameen's" credit card. At the FBI's direction, CW-2 gave Janjua $4,000 in United States currency as partial payment for the "Amjad" and "Ameen" files.

On February 24, 2009, CW-2 met with Defendant and Choudhry at Nazir Associates in Queens, New York. During that meeting, Choudhry gave CW-2 the personal identification information of "Ameen" and "Amjad," including Social Security numbers, dates of birth and email addresses. Choudhry also gave CW-2 a copy of a phone bill in "Ameen's" name.

The March 2009 Files

On March 4, 2009, while traveling in a car in Manhattan, New York, Janjua offered CW-2 the opportunity to

13

purchase files in the names of six individuals. Janjua estimated the files he showed CW-2 were worth between $300,000 and $400,000. Janjua gave the files to CW-2 so that CW-2 could review them and decide whether to purchase them. CW-2 provided the files to FBI agents in Manhattan, New York, and the FBI made copies of each file. CW-2 later returned the files to Janjua and told him that CW-2 was not interested in purchasing them.


The April 2009 Files and Collusive Charges


In April 2009, the FBI introduced an undercover agent ("UC") purportedly interested in selling filed to members of the Nazir Associates Fraud Ring. On April 2, 2009, Janjua met with the UC in Manhattan, New York. During that meeting, the UC agreed to sell Janjua 18 files so that Janjua could use them for credit card fraud. The UC also agreed to give Janjua two credit cards to begin their relationship. Janjua agreed to make collusive charges using those cards, and to give the UC a portion of the proceeds from those collusive charges. As described below, CW-2 later gave those two credit cards to Defendant.


In April 2009, the FBI provided CW-2 with two credit cards which were purportedly from the UC, in the names of


14

fictitious individuals (the "April 2009 Credit Cards").

On April 9, 2009, CW-2 met with Defendant at Nazir Associates and gave Defendant the April 2009 Credit Cards. Referring to the 18 files the UC had agreed to sell to Janjua, Defendant asked, "Is this from that eighteen?" CW-2 explained that the cards were separate from those 18 files. Defendant also asked, "How much is there on these two?" referring to the available credit amount on each of the April 2009 Credit Cards. CW-2 told him each card had $5,000 of available credit.

Throughout April and May 2009, CW-2 was paid at least $1,200 by Defendant for collusive charges made using the April 2009 Credit Cards. At least $10,000 was charged to the April 2009 Credit Cards. The charges were credited to the accounts in the name of "Rabia International" and "Rabia Forex." Records from the New York Department of State indicate that "Rabia Forex" is registered as a corporation in New York and lists 45 West 34th Street, New York, New York, as the address to which process should be served. That address is the same address at which Nazir Associates' Manhattan office was located.

Identity Theft

15

Defendant and Janjua also repeatedly acknowledged to CW-2 that they sold and used the personal identification information of other individuals. On February 26, 2009, in a recorded conversation with CW-2, Defendant explained that he was using the personal identification information of people previously in the United States but had since left the country. When CW-2 asked whether the people could return to the United States, Defendant explained: "They can't make it back, not on this name. They cannot make it back on this name, Social Security number, or date of birth. If they return under a different name, that is a different story."

CW-2 asked Defendant whether he had bought this information from the individuals. Defendant responded, "No, of course I did not buy them. They had come to me to get their problems taken care of." When CW-2 asked why these people left the United States, Defendant explained, "They just did not have green cards, buddy."

In March 2009, Defendant and Janjua discussed with CW-2 the possibility of changing the addresses associated with certain files. One of those files was in the name of an individual identified herein as "Mahboob." At the direction of the FBI, CW-2 provided Defendant and Janjua with an address in

16

the Bronx, New York (the "Bronx Address") for the purpose of
having mail delivered to that address in connection with the
credit card fraud scheme.   The Bronx Address was in fact an
address monitored and controlled by the FBI.   Subsequently, mail
in "Mahboob's" name was delivered to the Bronx Address and
recovered and by the FBI.

On May 7, 2009, CW-2 met with Janjua and delivered to
him mail in "Mahboob's" name.   The meeting was recorded by CW-2.
During the meeting, CW-2 asked Janjua, "Does this person exist?"
Janjua responded, "Yes he does."   CW-2 later asked "So is this a
genuine person or is he dead?"   Janjua responded, "Yes he is a
genuine person."   When CW-2 asked where the person was, Janjua
responded, "He's gone, it's a real person, real person."
Janjua's response meant that "Mahboob" was a real person who had
left the United States.

In June 2009, Defendant gave CW-2 $50 and asked CW-2
to pay a credit card bill in the name of an individual
identified herein as "Abid."   CW-2 subsequently paid "Abid's"
credit card bill.   Mail addressed to "Abid" also was retrieved
from the Bronx Address.   CW-2 delivered that mail to members of
the Nazir Associates Fraud Ring.

17

Based on the information that CW-2 provided regarding "Mahboob," law enforcement officers obtained records regarding "Mahboob" from the Social Security Administration and confirmed that "Mahboob" was issued a valid Social Security number. Officers also learned from the New York State Department of Motor Vehicles that "Mahboob" was issued a New York State driver's license. This information corroborated the statement of Janjua that "Mahboob" was a "real person."

Based on the information that CW-2 provided regarding "Abid," law enforcement officers obtained records from Immigration and Customs Enforcement regarding "Abid." Those records revealed that "Abid" was deported in 1999. This information corroborates the statements of Defendant that the Nazir Associates Fraud Ring obtains information from individuals and, after those individuals are deported or otherwise leave the United States, use that information to commit credit card fraud.

The total loss attributable to the offense is $687,170.36. This calculation is based on total charges run through credit card merchant machines located at Nazir Associate's offices. Those machines revealed charges of $424,513.04; $77,310.75; $46,234.09; and $139,112.48 in the names of various businesses established by the Nazir Associates

18

Fraud Ring. The amount of $454,943.99 represents the restitution amount for which the Government was able to identify specific victims with respect to those charges. The Government has identified 21 victims.


Fraudulent Green Cards


Defendant on three occasions helped aliens submit applications for fraudulent green cards through a company in Virginia. Defendant believed that only one application resulted in an actual green card being issued. Defendant accompanied these individuals to the Virginia company so that the company could "hire" them long enough for them to obtain a paystub that they could use to substantiate their work status. The Virginia company had no intention of actually employing the aliens.


Defendant has also participated in certain activity that is considered relevant conduct for sentencing purposes: Defendant committed mortgage fraud on his own home loan. The company that he used as an intermediary with the bank asked Defendant to give them a check for $1500 which they stated they needed to get the bank loan but would never in fact cash. When Defendant consulted with his lawyer, his lawyer told him that this had to be fraud, but Defendant obtained the loan anyway and

provided the check, which never was cashed.  It is likely that this was a "show check."  No loss amounts have been identified.

Janjua was arrested on September 30, 2009.  The parties have stipulated that Janjua was a manager or supervisor of the conspiracy.  Defendant was arrested on September 30, 2009.  The Government indicates that Defendant played a leadership role in the Fraud Ring (but not a leader or organizer) and the criminal activity involved five or more participants or was otherwise extensive.

Victim Impact

The Government identified the following victims and their respective losses:

| | |
|---|---|
| FBI | $21,564.99 |
| NCO/Bank of America | $12,970 |
| Bank of America | $99,738; $81,781; $5,013; $3,887 |
| Household Retail Services | $3,635 |
| T-Mobile | $825 |
| Capital One | $14,122 |
| Capital One Auto Finance | $25,972 |

20

| | |
|---|---|
| Verizon | $764; $210 |
| American Express | $5,529; $5,551; $1,088; $12,066 |
| Citi | $26,103; $14,108; |
| Citibank NA | $6,583 |
| Citibank DS NA | $17,119 |
| Citibank SD NA | $11,255 |
| Shell/Citibank | $370 |
| DSNB Macy's | $7,272; $3,036 |
| Chase | $27,501; $7,364; $11,464 |
| Children's Place/CBSD | $398 |
| GEMB/JC Penney | $489 |
| First Premier | $320 |
| GEMB/Amazon | $473 |
| Sunoco | $1,330 |
| BL | $556 |
| Asset Acceptance Corp | $2,358 |
| GEMB/Lord & Taylor | $124 |
| Discover | $5,889 |
| HSBC/BB | $4,374 |
| HSBC | $11,742 |
| **Total** | **$454,944.19** |

## The Relevant Statutory Provisions

For Count 1, the maximum term of imprisonment is 7.5 years, pursuant to 18 U.S.C. § 1029(b)(2).  For Count 2, the maximum term of imprisonment is 10 years, pursuant to 18 U.S.C. §§ 1029(a)(2) and (c)(1)(A)(i).  For Count 3, the maximum term of imprisonment is 15 years, pursuant to 18 U.S.C. §§ 1029(a)(5) and (c)(1)(A)(ii).  For Count 4, the required term of imprisonment is 2 years, to run consecutively to any other count, pursuant to 18 U.S.C. § 1028A.  For Count 5, the maximum term of imprisonment is 5 years, pursuant to 18 U.S.C. § 371.

For Counts 1, 2, 3 and 5, if a term of imprisonment is imposed, the Court may impose a term of supervised release of not more than three years on each count, pursuant to 18 U.S.C. § 3583(b)(2).  For Count 4, if a term of imprisonment is imposed, the Court may impose a term of supervised release of not more than one year, pursuant to 18 U.S.C. § 3583(b)(3). Such terms of supervised release run concurrently, pursuant to 18 U.S.C. § 3624(e).

For Counts 1, 2, 3 and 5, the Defendant is not eligible for probation because he is being sentenced at the same time to a term of imprisonment on a different count or case, pursuant to 18 U.S.C. § 3561(a)(3).  For Count 4, the Defendant

22

is not eligible for probation because the instant offense is one for which probation has been expressly precluded by statute 18 U.S.C. § 1028A, pursuant to 18 U.S.C. § 3561(a)(2).

For Counts 1 through 5, the maximum fine is $250,000 on each count, pursuant to 18 U.S.C. § 3571(b)(3).  A special assessment of $500 is mandatory, pursuant to 18 U.S.C. § 3013.

Full restitution to the victims is required under 18 U.S.C. § 3663A and 18 U.S.C. § 3664.  Full restitution is owed by Defendant, jointly and severally with co-defendant Janjua. The list of victims/restitution information is appended to the final disclosure of the PSR and hereby adopted by the Court.

**The Guidelines**

The November 1, 2013 edition of the United States Sentencing Commission Guidelines Manual has been used in this case for calculation purposes, pursuant to § 1B1.11(a). Defendant's applicable offense level, criminal history, recognition of responsibility and term of imprisonment are as follows:

Counts 1 through 3 shall be grouped pursuant to

23

§ 3D1.2(d), as the offense level is determined largely on the basis of the total amount of loss, and the offense was ongoing or continuous in nature and the offense guideline is written to cover such behavior. Count 5 constitutes a separate harm and will be calculated as a separate group. With respect to Count 4, 18 U.S.C. § 1028A calls for a mandatory term of imprisonment, and the guideline range is that prescribed by statute.


Counts 1, 2 and 3


The guideline for violations of 18 U.S.C. § 1029 is found in § 2B1.1(a)(2), which provides for a base offense level of 6. Because the loss attributable to the Defendant is more than $400,000, but not more than $1,000,000, an increase of 14 levels is applicable, pursuant § 2B1.1(b)(1)(H). No losses were identified for the relevant conduct detailed in the Offense Conduct, namely the Defendant's behavior in obtaining a fraudulent home loan for his home, and assisting another individual in obtaining a fraudulent loan from a bank by completing false information on the loan application. Because the offense involved more than 10 victims, but less than 50, an increase of two levels is applicable, pursuant to § 2B1.1(b)(2)(A)(i). Because the offense involved the possession and use of an authentication feature, pursuant to

24

§ 2B1.1(b)(11)(A)(ii), an increase of two levels is applicable. A three-level increase is warranted because Defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive § 3B1.1

According to the PSR, the subtotal offense level for Counts 1 through 3 is 27.

Count 5

The guideline for a violation of 18 U.S.C. § 371 is found in § 2X1.1.   Pursuant to § 2X1.1(a), the base offense level is the base offense level from the guideline for the substantive offense plus any adjustment from such guideline for any intended offense conduct that can be established with reasonable certainty.   The underlying offense in this case, which is in violation of 18 U.S.C. § 1546, is covered by § 2L2.1. Pursuant to § 2B1.1(a)(2), the base offense level is 11.

According to the PSR, the subtotal offense level for Count 5 is 11.

25

According to the PSR, the combined adjusted offense level for Counts 1 through 3 and 5 is 27.

Based on Defendant's statement and plea allocution, Defendant has shown recognition of responsibility for the offense. Because of Defendant's timely notification of his intention to plead guilty, thus allowing the Government to allocate its resources more efficiently, and because the aforementioned base offense level is 16 or greater, pursuant to §§ 3E1.1(a) and (b), the offense is reduced three levels.

According to the PSR, the total offense level for Counts 1 through and 5 is 24.

Defendant has no known previous criminal convictions. Therefore, the Defendant has zero criminal history points and a Criminal History Category of I.

Based on a total offense level of 24 and a Criminal History Category of I, the guideline range for imprisonment is 51 to 63 months, to be followed by a mandatory 24 months for Count 4. Thus, the range of imprisonment is 75 to 87 months.

The Guideline range for a term of supervised release

for Counts 1, 2, 3 and 5 is at least one year but not more than three years on each count, pursuant to § 5D1.2(a)(2). The guideline range for a term of supervised release for Count 4 is one year, pursuant to § 5D1.2(a)(3). The Court shall order a term of supervised release when required by statute (§ 5D1.1(a)(1)). If a sentence of imprisonment of one year or less is imposed, a term of supervised release is not required but is optional, pursuant to § 5D1.1(b). Supervised release is required if the Court imposes a term of imprisonment of more than one year or when required by statute, pursuant to § 5D1.1(a).

Defendant is not eligible for probation for Counts 1, 2, 3 and 5 because the instant offense is one for which probation has been expressly precluded by statute, pursuant to § 5B1.1(b)(3). Defendant is not eligible for probation for Count 4 because the instant offense is one for which probation has been expressly precluded by 18 U.S.C. § 1028A, pursuant to § 5B1.1(b)(2). Also, because the applicable guideline range is in Zone D of the Sentencing Table, Defendant is not eligible for probation, pursuant to § 5B1.1, application note #2.

The fine range for the instant offense is from $10,000 to $100,000 pursuant to § 5E1.2(c)(3). Subject to the

27

Defendant's ability to pay, in imposing a fine, the Court shall consider the expected costs to the Government of any imprisonment, probation or supervised release pursuant to § 5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests a monthly cost of $2,412.33 to be used for imprisonment, a monthly cost of $278.95 for supervision and a monthly cost of $2,244.17 for community confinement.

Pursuant to § 5E1.1(a)(1), in case of an identifiable victim, the Court shall enter a restitution order for the full amount of the victim's loss if such order is authorized under 18 U.S.C. § 3663A. Full restitution to the victims is required under 18 U.S.C. § 3663A and 18 U.S.C. § 3664. Full restitution is owed by Defendant, jointly and severally with co-defendant Janjua. The list of victims/restitution information is appended to the final disclosure of the PSR and hereby adopted by the Court.

Pursuant to Rule 32.2, "[t]he Court must include the forfeiture when orally announcing the sentence or must otherwise ensure that the Defendant knows of the forfeiture at sentencing. The Court must also include the forfeiture order, directly or by reference, in the judgment."

28

**The Remaining Factors of 18 U.S.C. § 3553(a)**

Having engaged in the Guidelines analysis, this Court also gives due consideration to the remaining factors identified in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not greater than necessary," as is required by the Supreme Court's decision in Booker, 543 U.S. 220, and the Second Circuit's decision in Crosby, 397 F.3d 103. In light of the Court's statutory responsibility "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," Kimbrough v. United States, 552 U.S. 85, 102 (2007) (quoting 18 U.S.C. § 3553(a)), and having considered the Guidelines and all of the factors set forth in § 3553(a), it is determined that a Guidelines sentence is warranted in the instant case.

**The Sentence**

Defendant will be sentenced to 51 months' imprisonment for Counts 1, 2, 3 and 5, followed by 24 months' imprisonment for Count 4, to run consecutively to all other Counts, for a total of 75 months' imprisonment. The imprisonment is to be followed by three years' supervised release for Counts 1, 2, 3

29

and 5 and one year for Count 4, to run concurrently.

As mandatory conditions of his supervised release, Defendant shall:

(1) Not commit another federal, state or local crime;

(2) Not illegally possess a controlled substance;

(3) Not possess a firearm or destructive device;

(4) Refrain from any unlawful use of a controlled substance. Defendant shall submit to one drug testing within fifteen (15) days of placement on probation or supervised release and at least two unscheduled drug tests thereafter, as directed by the probation officer; and

(5) Cooperate in the collection of DNA as directed by the probation officer.

Furthermore, the standard conditions of supervision (1-13), shall be imposed with the additional special conditions:

Defendant shall provide the probation officer with

30

access to any requested financial information.

Defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer unless Defendant is in compliance with the installment payment schedule.

Defendant shall notify third parties of risks that may be occasioned by his criminal record, and shall permit the probation office to make such notifications and to confirm Defendant's compliance with this requirement.

Defendant shall obey the immigration laws and comply with the directives of immigration authorities.

Defendant shall submit his person, residence, place of business, vehicle or any other premises under his control to a search on the basis that the probation officer has reasonable belief that contraband or evidence of a violation of the conditions of the release may be found.  The search must be conducted at a reasonable time and in reasonable manner. Failure to submit to a search may be grounds for revocation. Defendant shall inform any other residents that the premises may be subject to search pursuant to this condition.

31

Defendant is to report to the nearest Probation Office within 72 hours of release from custody.   Defendant shall be supervised by the district of residence.

Defendant shall pay to the United States a special assessment of $500, which shall be due immediately.

Because Defendant does not have the ability to pay a fine, no fine is imposed.

The Court finds that various persons have suffered injuries compensable under the Victim and Witness Protection Act.   Defendant shall make restitution to such persons totaling at least $454,944.19, except that no further payment shall be required after the sum of the amounts actually paid by all defendants has fully covered all of the compensable injuries. Any payment made by Defendant shall be divided among the persons named in the PSR in proportion to their compensable injuries.

Defendant shall make restitution payable to the Clerk, U.S. District Court, for disbursement to the victims.   The restitution shall be paid in monthly installments of 10% of gross monthly income over a period of supervision to commence 30

32

days after the date of the judgment or the release from custody
if imprisonment is imposed.   Defendant shall notify the United
States Attorney for this district within 30 days of any change
of mailing or residence address that occurs while any portion of
the restitution remains unpaid.   If Defendant is engaged in a
BOP non-UNICOR work program, Defendant shall pay $25 per quarter
toward the criminal financial penalties.   However, if Defendant
participates in the BOP's UNICOR program as a grade 1 through 4,
Defendant shall pay 50% of his monthly UNICOR earnings toward
the    criminal    financial    penalties,    consistent    with    BOP
regulations at 28 C.F.R. § 545.11.

Defendant shall forfeit to the United States, pursuant
to 18 U.S.C. §§ 1029(c)(1)(C) and (c)(2), and 21 U.S.C. § 853,
any personal property used or intended to be used to commit the
offenses charged in Counts 1, 2 and 3 of the Information.

Defendant is viewed as a good candidate for voluntary
surrender.   He has kept all court appearances and has been in
compliance   with   all   terms   and   conditions   of   his   pretrial
release.   He is not viewed as a flight risk or a danger to the
community.

The terms of this sentence are subject to modification

33

at the sentencing hearing scheduled for November 12, 2013.


It is so ordered.


New York, NY
November    7   , 2013

ROBERT W. SWEET
U.S.D.J.